### UNITED STATES BANKRUPTCY COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | **Chapter 11** |
| | : | |
| **R.H.R. MECHANICAL CONTRACTORS, INC.** | : | |
| | : | **Bky. No. 04-18715ELF** |
| Debtor | : | |
| | : | |

# O P I N I O N

### BY:  ERIC L. FRANK,  U.S.  BANKRUPTCY JUDGE

## I.    INTRODUCTION

Presently before me in this Chapter 11 case is the Objection of R.H.R. Mechanical

Contractors, Inc. ("the Debtor" or "R.H.R.") to the proof of claim of Claimant Sheet Metal

Workers Local 19 Benefit Funds ("the Union").

The Union asserts an unsecured claim based on a pre-petition writ of execution it

served on the Debtor[1] to collect a judgment the Union obtained against one of the Debtor's

creditors, Harkins Sheet Metal, Inc. ("Harkins").   Harkins owed the Union money for delinquent

benefit fund contributions.  The Union obtained a federal district court judgment against Harkins

with respect to the past-due funds.  Then, to execute on that judgment, the Union served a writ of

execution and interrogatories in attachment on the Debtor, asserting a right to be paid amounts

the Debtor allegedly owed Harkins for sheet metal work Harkins performed on two construction

projects for Debtor.  In its answers to the Union's interrogatories in attachment filed in federal

---

[1]        The Union's writ of execution was served on "The Perotti Group, Inc.", which the
Debtor describes as a predecessor entity to R.H.R.  The Debtor treats service upon Perotti as
effective against R.H.R. (N.T. at 45).  For this reason, and for ease of understanding, when
discussing the service of the writ of execution, I will use "R.H.R." or "the Debtor" to encompass
R.H.R. and The Perotti Group, Inc.

district court, the Debtor denied owing money to Harkins.   In its Objection, the Debtor

challenges the Union's authority to assert a claim and contends that it owes Harkins no money.

       For the reasons set forth in this Opinion, I overrule the Debtor's objections to the Union's

claim and allow the Union an unsecured claim in the amount of $68,697.86.

## II.    PROCEDURAL HISTORY

       The Debtor commenced this bankruptcy case on June 25, 2004 by filing a

voluntary petition under chapter 11 of the Bankruptcy Code.   The Debtor's chapter 11 plan was

confirmed by an Order entered on February 8, 2006.

       On May 25, 2005, the Union filed Claim No. 41, the claim that is at issue.   On

April 26, 2006, the Debtor filed an Omnibus Objection to Claims, which included the Debtor's

objections to the Union's proof of claim.

       Following a period for informal discovery, I held a trial on September 13, 2006 on

the Objection to the Union's claim.   At trial, the Debtor and the Union each called one witness to

testify: Raymond Perotti, President of R.H.R. for the Debtor and Tom Harkins, former President

of Harkins for the Union.   Both sides also introduced documents into evidence, which largely

consisted of invoices and summaries of accounts payable.   After the trial, the parties also briefed

their respective positions and this matter is now ready for disposition.

### III.   FINDINGS OF FACT

**A.    The Ardmore Project**

1.      In 2002, a general contractor retained to do construction work at the proposed site for the new Ardmore Farmer's Market in Ardmore, Pennsylvania hired R.H.R.,[2] as a subcontractor, to do heating, ventilation and air conditioning ("H.V.A.C.") work at the site. (N.T. at 16-17).

2.      The Ardmore Farmer's Market was to be comprised of a series of small stores, or stalls, that sold merchandise to customers.  (N.T. at 31, 53).  Its construction involved the erection of a brand new building, not merely alteration of an existing structure.  (N.T. at 69).

3.      The Farmer's Market was slated for a grand opening on October 29, 2003. (N.T. at 24 ).

4.      On November 22, 2002, Harkins submitted a faxed bid to Ken Harle at R.H.R. to do certain sheet metal work at the Farmer's Market, including the installation of the duct work, the air distribution system, the exhaust and hood work for each individual stall, and the mounting of H.V.A.C. on the Ardmore Market's roof (the "Ardmore Project").  (N.T. at 17-18, 52-53).

5.      Prior to this time, Harkins and R.H.R. had a working relationship that spanned approximately ten years.  (N.T. at 47).  During that relationship, Harkins performed work on approximately 15 to 20 construction jobs for R.H.R.  (N.T. at 32, 47-48).

6.      Throughout its ten-year relationship with R.H.R., Harkins' main contact at

---

[2]      In my Findings of Fact, I use "R.H.R." to refer to the Debtor pre-petition, and "the Debtor" to pertain to R.H.R. for the time period following the Debtor's filing of its Chapter 11 petition.

R.H.R. was R.H.R.'s salesman/project manager, Ken Harle.  (N.T. at 47-48).

      7.    Harkins' bid for the Ardmore Project was for $91,400.  (N.T. at 16,

Ex. D-1).

      8.    Harkins relied upon the initial plan specifications and drawings

provided to him by Ken Harle in preparing his bid. (N.T. at 53, 69).

      9.    Ken Harle communicated R.H.R.'s acceptance of Harkins' bid to Harkins.

(N.T. at 30, 52).

      10.    There is no written contract between R.H.R. and Harkins with respect

to the Ardmore Project.  (N.T. at 17, 32).

      11.    The H.V.A.C. system at the Ardmore Farmer's Market could not be

installed in accordance with the initial plan specifications that Harle provided to Harkins for the

formulation of its bid.  (N.T. at 31, 53-55).

      12.    For example, the duct work R.H.R. retained Harkins to install on the

Ardmore Project could not be completed as envisioned by the initial plan specifications.  (N.T. at

32, 53-54).  There were plumbing, sprinkler and electrical pipes in the way of duct work

needed for the Farmer's Market and the initial plan specifications did not account for these

obstacles.  (N.T. at 54).

      13.    Further, the H.V.A.C. needs of some of the stall owners at the Ardmore

Farmer's Market changed from those in the initial plan specifications once the owners entered

their stall areas and these changes, in turn, expanded the work that Harkins needed to perform on

the Ardmore Project.  (N.T. at 54).

      14.    Ultimately, the Ardmore Project turned out to be significantly different

-4-

from the job that was envisioned by the original plan specifications that Harkins relied upon in submitting its initial bid.  (N.T. at 31-32, 54).  The Ardmore Project required Harkins to do more work than it might have anticipated from the initial plan specifications.

15.    Harkins reported to Ken Harle with respect to the Ardmore Project and a second joint construction project between the parties, the Bahama Breeze Project, that is discussed below.  (N.T. at 35).  R.H.R. considered Ken Harle to be its "point person" on these Projects. (N.T. at 30).

16.    Consistent with the past practice of the parties, Harkins operated pursuant to the belief that Ken Harle had the authority to give final, binding orders with respect to the work that Harkins was retained to do on the Ardmore Project and Bahama Breeze Projects.  (N.T. at 47-48).

17.    R.H.R. never communicated to Harkins any requirement that Harkins obtain written authorizations or submit written change orders prior to performing extra work (i.e., work that went beyond the scope of Harkins' initial bid) on the Ardmore Project or the Bahama Breeze Project described below.  (N.T. at 33, 49).

18.    Harkins did not submit written change orders to R.H.R. with respect to extra work done on the Ardmore or Bahama Breeze Projects.  (N.T. at 19).   Instead, when Harkins realized that some portion of the Projects required additional work, Harkins would submit an estimate to Ken Harle concerning what the additional or different work would cost. (N.T. at 55).

19.    Harkins assumed Harle passed on Harkins' estimate to the site owner. (N.T. at 55).

20.     Ken Harle authorized the work that Harkins did on the Ardmore Project that went beyond the scope of Harkins' initial estimate.  (N.T. at 55, 59).

21.     R.H.R. and Harkins were under significant time pressure to complete the Ardmore Project in time for its slated grand opening date.  (N.T. at 24).  The late arrival of certain equipment at the site of the Ardmore Project contributed to the time pressure.  (N.T. at 53).

22.     Harkins finished the Ardmore Project (N.T. at 55) and did not receive any requests to return to the site to correct any work it did.  (N.T. at 56).

23.     Harkins' submitted a total of ten invoices to R.H.R. for the Ardmore Project.  (N.T. at 57-59; Trial Ex. D-2; Trial Ex SMW-16).  They included:

| Invoice Number | Date | Amount Billed | Amount Paid | Retainage | Includes Extra Work |
|---|---|---|---|---|---|
| 2989 | 7/15/03 | $20,000 | $18,000 | $2,000 | No |
| 3000 | 8/15/03 | $40,000 | $36,000 | $4,000 | No |
| 3014 | 9/24/03 | $20,000 | $18,000 | $2,000 | No |
| 3022 | 10/16/03 | $11,400 | $10,260 | $1,140 | No |
| 3027 | 10/16/03 | $14,900 | $13,410 | $1,490 | Yes |
| 3028 | 10/16/03 | $ 7,500 | $ 6,750 | $  750 | Yes |
| 3029 | 10/16/03 | $10,300 | $ 9,270 | $1,030 | Yes |
| 3030 | 10/16/03 | $18,700 | $ 4,050 | $1,870 | Yes |
| 3031 | 10/16/03 | $ 8,700 | $     0 | $     0 | Yes |
| 3032 | 10/16/03 | $12,400 | $     0 | $     0 | Yes |
| | | **$163,900** | **$115,740** | | |

24.    The "retainage" referenced in Harkins' invoices (Trial Ex. SMW-15,

SMW-16) and in R.H.R.'s account payable summaries (Trial Ex. D-2, D-5) refers to an amount

that R.H.R. held back from Harkins to ensure the completion of the contract work.  (N.T. at 35).

Retainage would become due to Harkins either one year after the project was completed or when

R.H.R. received its retainage from the general contractor, whichever happened sooner.  (N.T. at

36).

25.    In total, Harkins billed R.H.R. $163,900 for the Ardmore Project.  (N.T. at

18).  R.H.R. paid Harkins a total of $115,740, leaving an unpaid difference of $48,160.  (N.T. at

56).

26.    The total amount R.H.R. paid Harkins includes $24,340 in excess of the

$91,400 original contract amount.  The payment was for extra work done in individual stalls at

the Ardmore Farmer's Market with respect to which Harkins had not submitted written change

orders, but had received Ken Harle's authorization.  (Trial Ex. SMW-16; Trial Ex. D-2; N.T. at

19, 55, 59).

27.    The Ardmore Project was completed on time, but R.H.R. needed to supply

additional labor to assist in completing the job.  (N.T. at 24, 43).  There were no damages

associated with this provision of extra labor.[3]

28.    Sometime in October 2003, prior to the completion of the Ardmore

Project, the general contractor sent a letter to R.H.R. stating that, during a recent site visit, the

---

[3]    R.H.R. did not produce any evidence that linked the provision of additional
laborers with financial loss to R.H.R. or that attributed the need to provide extra labor solely to
Harkins.  To the contrary, the evidence suggested that the Ardmore construction project, as a
whole, was running behind schedule and that this was caused, in part, by the fact that equipment
arrived to the site late.  (N.T. at 24, 53).

general contractor had observed that workers had left "metal screws, drywall screws, storefront screws" on the roof of the Farmer's Market as well as "construction materials, debris, broken crates and nails and screws sticking out, sharp edged sheet metal, chunks of stucco of all sizes." (Trial Ex. D-3).

29    R.H.R. believed Harkins' workers to be amongst those referenced in the general contractor's letter. (N.T. at 23). R.H.R. conceded, however, that Harkins was not the only contractor doing work on the roof. (N.T. at 56). Carpenters, plasterers, electricians and plumbers were also amongst those workers completing projects on the Ardmore Farmer's Market roof. (N.T. at 56).

30.    Harkins and others cleaned up the roof. (N.T. at 34, 56).

31.    R.H.R. did not suffer any financial loss as a result of this incident and acknowledged that it did not consider the incident regarding the debris on the roof to be unusual in the construction context. (N.T. at 33-34).[4]

B.    **The Bahama Breeze Project**

32.    R.H.R. was also retained as a subcontractor to do work at the Bahama Breeze restaurant in King of Prussia, Pennsylvania. (N.T. at 27).

33.    R.H.R. retained Harkins to do air conditioning duct work at the restaurant (the "Bahama Breeze Project"). (N.T. at 27, 49).

34.    Ken Harle negotiated the terms of the Bahama Breeze Project with

---

[4]    R.H.R. did not produce any evidence that it suffered damages as a result of Harkins' involvement with the incident concerning debris on the roof.

Harkins and communicated R.H.R.'s acceptance of Harkins' bid. (N.T. at 27, 49).

35.     As with the Ardmore Project, there was no written contract between R.H.R. and Harkins with respect to the Bahama Breeze Project.  (N.T. at 27).

36.     Harkins based its bid for the Bahama Breeze Project on the initial plan specifications and drawings provided to him by Ken Harle.  (N.T. at 69).

37.     Ken Harle authorized Harkins to perform the work on the Bahama Breeze Project that went beyond Harkins' initial estimate.  (N.T. at 55).

38.     Harkins completed the Bahama Breeze Project.  (N.T. at 49).

39.     Harkins did not receive any requests to return to the Bahama Breeze Project site to correct any work it performed.  (N.T. at 51).

40.     Harkins submitted five invoices to R.H.R. for payment for work it did on the Bahama Breeze Project.  (N.T. at 50, 59; Trial Ex. D-5; SMW-15).  They included:

| Invoice Number | Date | Amount Billed | Amount Paid | Retainage | Includes Extra Work |
|---|---|---|---|---|---|
| 2980 | 6/18/03 | $ 9,000 | $ 9,000 | $ 1,000 | No |
| 2990 | 7/15/03 | $27,000 | $27,000 | $ 3,000 | No |
| 3001 | 8/15/03 | $27,000 | $21,500 | $ 3,000 | No |
| 3033 | 10/16/03 | $ 6,400 | $    0 | $    0 | Yes |
| 3048 | 11/20/03 | $ 7,000 | $    0 | N/A | No |
|  |  | **$76,400** | **$57,500** |  |  |

41.     On October 29, 2003, R.H.R. imposed a $1,005 back charge against its accounts payable to Harkins for the Bahama Breeze Project.  (Trial Ex. D-5).

42.     In total, Harkins billed R.H.R. $76,400, was paid $57,500 by R.H.R. (N.T.

at 27, Trial Ex. D-5) and incurred a $1,005 back charge, leaving a difference of $17,895.00.

      43.    Harkins ceased doing business in March 2004.  (N.T. at 46, 64).


**C.**      **Union's Pre-Petition Garnishment of the Debtor**

      44.    On February 12, 2003, the United States District Court for the Eastern District of Pennsylvania entered a Judgment by Default against Harkins and in favor of the Union for $69,504.48 in Sheet Metal Workers' Local 19, et al. v. Harkins Sheet Metal, Inc., Civ. Action No. 02-8239.  (Trial Ex. SMW-1)

      45.    The judgment entered against Harkins related to monies Harkins owed the Union for benefit packages for its former workers.  (N.T. at 62).

      46.    On April 2, 2004, the Union caused the Debtor to be served with a Writ of Execution and Interrogatories in Attachment in the amount of $72,180.15 in an effort to execute upon its judgment against Harkins.  (Trial Ex. SMW 3, 4).

      47.    On May 18, 2004, the Debtor filed an Answer to the Union's interrogatories denying that it owed Harkins any money.


**D.**      **The Bankruptcy Case and the Debtor's Objections to the Union's Claim**

      48.    On June 25, 2004, the Debtor filed its Chapter 11 bankruptcy petition.

      49.    On July 30, 2004, the Debtor filed, among other things, its bankruptcy Schedule F list of Creditors Holding Unsecured Nonpriority Claims in which it disclosed a $54,718.39  disputed debt to Harkins.

      50.    Harkins never filed a proof of claim in the bankruptcy case.

51.      On May 25, 2005, the Union filed a proof of claim asserting a $96,191

unsecured non-priority claim based on amounts it claimed the Debtor owed to Harkins.

52.      As of June 25, 2004, Harkins' claim against the Debtor totaled

$68,697.86.[5]

---

[5]      The Union's proof of claim was based upon the accounts payable record of
Harkins and its calculation of interest thereon.  My finding of the amount of Harkins' claim
against the Debtor is based on the entire trial record and supersedes the proof of claim.

The Debtor did not pay Harkins for $48,160.00 of work for the Ardmore Project.  See
Finding of Fact Nos. 23, 25.  The Debtor did not pay Harkins for $17,895.00 of work for the
Bahama Breeze Project.  For the Ardmore Project, I have added interest at the legal rate of 6% in
Pennsylvania for the period running thirty (30) days after the date of the last Ardmore Project
invoice to the date of the bankruptcy filing.  I have made the identical calculation for the Bahama
Breeze Project.  The end result is a total claim of $68,697.86.  My calculations are set forth
below:

**Ardmore**
November 16, 2003 to June 25, 2004 = 8.3 months

Accrued interest = $48,160.00 x  6%  x 8.3 divided by 12 = 1,998.64

**Bahama Breeze**
December 20, 2003 to June 25, 2004 = 7.2 months

Accrued interest = $17,895.00 x  6%  x 7.2 divided by 12 = 644.22

**Final Calculation**

| | |
|---|---:|
| Ardmore | $48,160.00 |
| Ardmore prepetition interest | 1,998.64 |
| Bahama Breeze | 17,895.00 |
| Bahama Breeze prepetition interest | 644.22 |
| **TOTAL** | **$68,697.86** |

## IV.   DISCUSSION

### A.    Whether the Union May Assert A Claim.

Section 101(5) of the Bankruptcy Code defines the term "claim," inter alia, to include the "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured."  11 U.S.C. § 101(5).  In fashioning the definition of a bankruptcy claim, "Congress intended to adopt the broadest available definition of that term."  In re Udell, 18 F.3d 403, 406 (7th Cir. 1994) (citations omitted); see In re Montgomery Ward, LLC, 292 B.R. 49, 53 (Bankr. D. Del. 2003).

In this case, aside from its having instituted early stage garnishment proceedings, the Union had no direct, pre-petition business relationship with the Debtor.  The Union is a stranger to the agreements between Harkins and the Debtor.  The Union is not, nor does it contend to be, a third-party beneficiary of the Ardmore or Bahama Breeze agreements.  The Debtor owed no duty to the Union by virtue of the Ardmore or Bahama Breeze agreements.  Consequently, the Debtor disputes the Union's right to file a claim on its own behalf in this bankruptcy case.

The Union's asserted claim in bankruptcy hinges solely on the garnishment proceedings it commenced against the Debtor with respect to monies it contends the Debtor owes to Harkins for the Ardmore and Bahama Breeze Projects.  To resolve the issue whether the Union may assert a claim here, I must examine whether a right to payment within the meaning of 11 U.S.C. §101 was created as a result of the pre-petition service of the Union's writ of execution on the Debtor.

-12-

1.    <u>Pennsylvania Law on Garnishment</u>

The Union sought to execute on a judgment rendered in the United States District

Court for the Eastern District of Pennsylvania.  Federal Rule of Civil Procedure 69(a) states that

"[t]he procedure on execution, in proceedings supplementary to and in aid of a judgment, and in

proceedings on and in aid of execution shall be in accordance with the practice and procedure of

the state in which the district court is held . . . ."  Therefore, Pennsylvania procedural and

substantive rules govern the attachment process.  <u>See also</u> <u>In re Bova</u>, 205 B.R. 467, 472 (Bankr.

E.D. Pa. 1997) (citations omitted) (state law governs the "incidence, operation and duration of

garnishment liens").

Under Pennsylvania law, garnishment is well-recognized as a tool that enables a

judgment creditor (such as the Union) to collect its debt by reaching assets of its judgment debtor

(here, Harkins) in the hands of a stranger (here, the Debtor).  <u>See</u> <u>Sevast v. Kakouras</u>, 841 A.2d

1062, 1066 (Pa. Super. Ct. 2003), <u>alloc. granted</u>, 861 A.2d 257 (2004); <u>Brown v. Candelora</u>, 708

A.2d 104, 107 (Pa. Super. Ct. 1998), <u>alloc. granted</u>, 725 A.2d 176 (Pa. 1999), <u>appeal withdrawn</u>

(Mar. 25, 1999).  For the purposes of garnishment practice, any "person may be a garnishee and

shall be deemed to have possession of property of the defendant" provided he or she "(a) owes a

debt to the defendant" or "(b) has property of the defendant in his custody, possession or control .

. . ."  Pa. R. Civ. P. 3101(b).

Service of the writ of execution on the garnishee immediately attaches the

property of the judgment debtor that is in the hands of the garnishee – provided that garnishment

is available for the type of property or debt sought to be attached by the judgment creditor.  <u>See</u>

Pa. R. Civ. P. 3111(b).  A judicial lien is created on such property of the judgment debtor.  That

-13-

lien arises as of and is perfected on the date on which the writ of execution is properly served

upon the garnishee holding the property.  See In re Allen, 228 B.R. 115, 119 (Bankr. W.D. Pa.

1998).


## 2.    Garnishment Of Unliquidated Claims

There is one limitation relating to the availability of the garnishment process to

reach certain types of debts or property that must be considered here.  Under Pennsylvania law,

certain unliquidated claims for breach of contract or for tort are not considered a "debt owed" or

"property" of the debtor and, therefore, the garnishment process may not be available to reach

such claims.  See, e.g.,  In re J. Robert Pierson, Inc., 44 B.R. 556, 559 (E.D. Pa. 1984)

(unliquidated claims for tort or breach of contract are not subject to garnishment); In re:

Moserbeth Assocs, I, L.P., 128 B.R. 716, 718 (Bankr. E.D. Pa. 1991) (unliquidated breach of

contract claims cannot serve as basis for garnishment unless the amount of recovery can be

ascertained by reference to contract); Brown, 708 A.2d at 108 (bad faith insurance claims are

unliquidated choses in action not subject to garnishment); Cf. Girard Fire & Marine Ins. Co. v.

Field, 45 Pa. 129, 133 (1863) (noting, in dicta, that "[w]e cannot come to the conclusion that

every unliquidated claim is without the reach of the attachment process.").

In this regard, the Pennsylvania Superior Court noted in Brown that,

> Only such debts as are not dependent upon a contingency but
> are certain and payable are properly attachable in garnishment
> proceedings.  An unliquidated claim for breach of contract is
> not a "debt owed" or "property" and "such a claim may not
> be attached as if it were the debtor's property in the garnishee's
> hands."

Id. at 108 (quoting In re J. Robert Pierson, Inc., 44 B.R. at 559).  In the nineteenth century, the

Pennsylvania Supreme Court explained the reason for this rule, stating that unliquidated claims

for breach of contract are "not definite enough to be classed as 'personal estate', 'goods and

chattels'" or "goods and effects."  Girard Fire & Marine Ins. Co., 45 Pa. at 133.  "They want

tangibility, and are not attachable . . . ."  Id.

        The Debtor has urged that the Union did not "perfect" its attachment – or, as I

interpret the Debtor's argument, that the Union's writ failed to attach to any property at its time

of service because the Ardmore and Bahama Breeze accounts payable claims were unliquidated

at the time and, therefore, were incapable of being reached through garnishment.  If the Debtor is

correct, the Union's attachment is a nullity.  See, e.g., Dunn v. Printing Corp. of America, 245 F.

Supp. 875, 880 (E.D. Pa. 1965) ("attachment is fruitless and a nullity if the garnishee has no

property of the defendant at the time the writ is served."), citing Falk & Co. v. So. Texas Cotton

Oil Co., 82 A.2d 27 (Pa. 1951).

        When seeking to determine whether a breach of contract claim is unliquidated and

unreachable by attachment, the Pennsylvania courts often look to the definition of an

unliquidated claim that was fashioned in Purdy v. Cope Hotels Co, Fidelity-Fire Ins. Co., 191 A.

636, 640 n.2 (Pa. Super. Ct. 1937).  There, an "unliquidated" breach of contract claim was

defined as being "one, the amount of which has not been fixed by agreement or cannot be

determined by the application of the rules of arithmetic or law."  Id.

        This focus on a claim's ability to be valued by reference to a definite, fixed

standard is echoed through much of the case law as an important part of the litmus test for

whether a claim is susceptible to garnishment.  Thus, for example, in Girard Fire & Marine Ins.

-15-

Co., the Pennsylvania Supreme Court held that an unadjusted insurance claim for fire loss on a

home could be attached where the policy terms were fixed, the agreement to pay was fixed, and

the valuation of the loss was subject to simple determination by reference to the property's fair

market value. Id. at 133.  Likewise, the Pennsylvania Superior Court found that a restitution

claim stemming from breach of a real estate contract constituted the sort of claim that could be

garnished because the value of the claim could be calculated easily – the court held that its value

was equal to the installment payments the non-breaching party had paid on the real estate.  See

Sevast, 841 A.2d at 1070;[6] see also Dunn, 245 F. Supp. 575 (contract claim subject to

garnishment where damages for breach of contract could be ascertained by applying a formula

for commissions set forth in parties' contract).

       In contrast, where the claim is one as to which damages are not capable of being

reduced to certainty by a fixed standard, but instead require the application of discretion in

making damages valuations, courts have held that the claim is unliquidated and not subject to

garnishment.  The Pennsylvania Superior Court held in Brown, for example, that a bad faith

insurance claim is unliquidated and not reachable through garnishment.  In evaluating the sort of

---

[6]      The Pennsylvania Supreme Court has granted allocatur in Sevast.  Among the
issues the Supreme Court has asked the parties to brief on appeal is whether the Superior Court
adopted too narrow a view with respect to the factors that should be considered in valuing the
restitution claim at issue.  See Sevast v. Kakouras, 861 A.2d 257 (Pa. 2004) (per curiam).  The
Superior Court viewed the restitution claim's value as being equal to the installment payments
the non-breaching party made on the land contract. The Supreme Court stated that it intends to
determine whether one would also need to consider the "fair rental value of the judgment
debtor's decade-long possession" of the land in valuing the claim, and, presumably, whether the
complexity of that valuation would render the claim unattachable through garnishment.  Id.

       Nevertheless, both Sevast's disposition in the Superior Court and the issues posed
in its pending appeal highlight the importance of scrutinizing a claim's susceptibility to valuation
by fixed means in determining whether a claim can be garnished.

damages that are potentially available for bad faith claims, the court noted that, in addition to

receiving the amount by which the judgment exceeded the policy limits, a successful bad faith

insurance litigant might also obtain punitive damages and attorney's fees.  Brown, 708 A.2d at

111.  Valuation of punitive damages is discretionary.  Resolution of such a claim would not be

"mechanical" and would rely on consideration of many "difficult to quantify factors" such as the

reasonableness of the failure to settle.  Id. at 109.  Consequently, the court determined that the

bad faith claim is not susceptible to attachment.[7]  See also Eaton v. Pittsburgh Terminal Coal

Corp., 84 F.2d 364 (3d Cir. 1936) (applying Pennsylvania law) (claim for breach of sale of coal

lands was not subject to garnishment before breach was found to exist where two courts provided

significantly different valuations of claim's value thus suggesting that there was no fixed

standard for valuing the claim); In re J. Robert Pierson, Inc., 44 B.R. 556 (breach of contract

claim for construction is unliquidated and not subject to garnishment where claim cannot be

decided by reference to fixed standard but instead required litigation to determine value of work

and value of substantial counterclaim); Selheimer v. Elder, 98 Pa. 154 (1881) (claim for trespass

---

[7]        The Brown court was also concerned with what it viewed as the potential injustice
that might occur if it were to hold that bad faith insurance claims were subject to garnishment.
Among other things, the court was troubled that the judgment creditor had chosen to pursue the
insurance company through garnishment rather than through an assignment of rights by the
insured.  The court observed that if the judgment creditor were permitted to seize potential claims
for bad faith while the insured was suffering under a sizable judgment for which the insurer
refused to indemnify him or her, then the insured would be deprived of the right to bargain with
the injured party for release of liability as consideration for an assignment of rights against the
insured.  See Brown, 708 A.2d at 113 & n10.

on land was unliquidated where there is no fixed standard for determining damages).[8]


### 3. The Ardmore and Bahama Breeze Project Claims are Subject To Garnishment

Turning to the Union's asserted claim, I find that the value of the Harkins claim

arising from the Ardmore and Bahama Breeze Projects is susceptible to being calculated by

reference to a fixed standard and that the amount of that claim can be determined by applying

simple rules of arithmetic.   The Debtor and the Union rely upon invoices and accounts payable

summaries to value these claims.   The amounts paid and unpaid are fixed and are not subject to

dispute by the parties.   What the Debtor disputes is liability.   In other words, the Debtor's

objection was presented in a primarily all-or-nothing posture: either I accept the Debtor's

argument that Harkins had no authority to perform any additional work on the Ardmore and

Bahama Breeze Projects and sustain the Debtor's objections and award the Union nothing, or I

accept the Union's argument that Harkins had authority for doing extra work and award the

---

[8]     I observe that bankruptcy courts, too, have struggled sometimes with the definition and application of the term "liquidated," albeit in an entirely different context – applying the debt ceiling for chapter 13 eligibility found in 11 U.S.C. §109(e).  The discussion in the bankruptcy cases under 11 U.S.C. §109(e) mirrors the discussion in the Pennsylvania cases discussed in the text.  Compare In re McGarry, 213 B.R. 272, 275 (Bankr. W.D. Pa. 1999) ("[t]he key factor in distinguishing liquidated from unliquidated claims is ... whether the process for determining the claim is fixed, certain, or otherwise determined by a specific standard"); In re Pennypacker, 115 B.R. 504, 506 (Bankr. E.D. Pa. 1990) ("[a] claim is liquidated if the evidence furnishes data which, if believed makes it possible to compute the amount with exactness, without reliance upon opinion or discretion") with In re Slack, 187 F.3d 1070, 1074 (9th Cir. 1999) (whether debt is liquidated "will depend on whether the amount is easily calculable or whether an extensive hearing will be needed to determine the amount of the debt, or the liability of the debtor").

balance due.  Further, the issue of liability as to these claims is straightforward and susceptible to

being determined from a relatively simple hearing.[9]

      Accordingly, my review of the available precedent and consideration of the nature

of the claims concerning the Ardmore and Bahama Breeze Projects and their valuation leads me

to predict that, under the circumstances, the Pennsylvania Supreme Court would view rule the

accounts payable claims at the time the Union served its writ of execution to be reachable

through garnishment.


      **4.**        **Confirmation of the Debtor's Plan Did Not Void the Union's
Claim**

      The Debtor also argues that the Union does not have the ability to assert a claim

here because the Debtor's plan extinguished the Union's garnishment, citing  11 U.S.C. §

1141(c) in support of its position.

      Section 1141 of the Bankruptcy Code sets forth the various effects of the

confirmation of a Chapter 11 Plan.  <u>See</u> 11 U.S.C. § 1141.  Section 1141(b) states that, unless

otherwise provided in the Plan or in an order confirming the Plan, following confirmation, all of

---

[9]     I acknowledge that the Debtor raised some issues with respect to the quality of the
work that Harkins did – issues primarily concerned with the incident concerning debris left on
the roof of the Ardmore Farmer's Market.  I also recognize that in <u>In re Pierson</u>, the federal
district court upheld the bankruptcy court's decision that a particular construction claim was
unliquidated and not subject to attachment.  <u>See</u> <u>In re Pierson</u>, 44 B.R. at 560.  Nevertheless, I
find that the present case is distinguishable from the circumstances in <u>In re Pierson</u>.  In <u>In re
Pierson</u>, the court decided that complex litigation was required to figure damages – <u>i.e.</u>, to place a
value on the work completed and the value of a significant counterclaim resulting from a breach
of contract.  <u>Id.</u>  Here, the dispute was a very simple one and damages were readily ascertainable
by reference to the invoices and accounts payable summaries that the parties produced and
application of the rules of arithmetic.

the property of the estate vests in the debtor.  Section 1141(c), in turn, provides that the property

that revests in the estate does so "free and clear" of certain liens, claims and interests of creditors.

Section 1141(c) is inapplicable here.  Neither Harkins (by virtue of its prepetition

contractual relationship with the Debtor) nor the Union (by virtue of the prepetition garnishment)

has asserted a secured claim against the Debtor.  Thus, there is no prepetition lien on property of

the Debtor that could have been extinguished by the operation of the Debtor's confirmed plan or

11 U.S.C. §1141(c). The Union is asserting a right to be paid money it contends is owed to

Harkins and perfected the right to assert a claim against the Debtor arising from the Debtor's

liability to Harkins  its prepetition service of the writ of execution.  Section 1141(c) does not

affect the assertions of such an unsecured claim.[10]

---

[10]  The Debtor cites In re Penrod, 169 B.R. 910 (Bankr., N.D. Ind. 1994), aff'd, 50 F.3d
459 (7th Cir. 1995) in report of its argument.  Penrod is inapposite.  In Penrod, the court held that
a creditor's lien on personal property was extinguished by the confirmation of a chapter 11 plan
that provided for payment of the creditor's secured claim but that did not provide that the creditor
would retain its lien post-confirmation.  Thus, Penrod involved the effect of 11 U.S.C. §1141(c)
on a secured creditor.  This case involves the claims of unsecured creditors.

The Debtor also cites In re Thomson McKinnon Securities, Inc., 125 B.R. 888 (S.D.N.Y.
1991) for the proposition that federal bankruptcy law supersedes state law and should be held
here to supersede and, presumably, void the Union's judicial lien.  In Thompson, the New York
State Comptroller relied upon a state statute relating to the recovery of abandoned property to
assert claims in bankruptcy on behalf of customers who had failed to meet the bankruptcy court's
bar date for the filing of timely claims.  See id. at 92-94.  The district court found that permitting
the State Comptroller to do indirectly through state law that which the bankruptcy laws prevent -
"namely, permitting barred claimholders to satisfy time-barred claims at the expense of other
allowed claims" - raised supremacy issues and accordingly disallowed the Comptroller's claims.
Id. at 94.  I find no similar state-federal conflict of laws here.

**5.     The Union Has the Right to file a Proof of Claim In Its Own Name**

The Debtor also makes one final argument in opposition to the Union's ability to assert a claim.  Referring to the principle in garnishment law that the garnishor's rights may rise no higher than its judgment debtor's, the Debtor argues that the Union must stand in Harkins' shoes and, as Harkins failed to assert proof of claim and thus is not entitled to receive anything in distribution, the Union is also entitled to nothing.

I disagree.  Based upon the Union's pre-petition garnishment of amounts owed to Harkins, the Union has a distinct right to payment of any moneys that the Debtor may owe to Harkins.  The Union has preserved that right by filing its own proof of claim in this bankruptcy case.

**B.     The Merits of the Union's Claim**

Having determined that the Union has the right to assert a claim for any amounts the Debtor owes to Harkins, I now turn to the merits of that claim.

A properly filed proof of claim is deemed allowed unless a party in interest objects. 11 U.S.C. § 501.  In a contested matter involving an objection to a proof of claim, the burden of proof rests on different parties at different times.  Even after an objection is filed, a properly filed proof of claim is prima facie evidence of the validity and amount of the claim. Fed. R. Bankr. P. 3001(f).  If an objection is filed to a proof of claim, the burden of proof may shift.  See  United States v. Baskin & Sears, P.C., 207 B.R. 84, 86 (E.D. Pa. 1997).  The Court of Appeals has concisely summarized the shifting burdens as follows:

> [A] claim that alleges facts sufficient to support a legal liability to the claimant
> satisfies the claimant's initial obligation to go forward. The burden of going
> forward then shifts to the objector to produce evidence sufficient to negate the
> prima facie validity of the filed claim. It is often said that the objector must
> produce evidence equal in force to the prima facie case. In practice, the objector
> must produce evidence which, if believed, would refute at least one of the
> allegations that is essential to the claim's legal sufficiency. If the objector
> produces sufficient evidence to negate one or more of the sworn facts in the proof
> of claim, the burden reverts to the claimant to prove the validity of the claim by a
> preponderance of the evidence.

In re Allegheny International, Inc., 954 F.2d 167, 173-74 (3d Cir. 1992) (citations omitted).   See
also In re Gimelson, 2004 WL 2713059, at *13 (E.D. Pa. 2004); In re Galloway, 220 B.R. 236,
244 (Bankr. E.D. Pa. 1998).

The principal dispute between the Debtor and the Union is whether Harkins had
authority to perform and bill for extra work,  i.e., work outside the scope of its initial bids, on the
Ardmore and Bahama Breeze Projects.[11]  The Debtor contends that Harkins performed extra

---

[11]      The Debtor's objections to the merits of the Union's claim focused in, large part,
on Harkin's right to payment for extra work done on the two construction projects.  The Debtor
did, however, make two other arguments on the merits.

First, the Debtor urged me to find, as a potential grounds for excusing further
payment to Harkins, that Harkins did substandard work on the Ardmore Project. In support of
this proposition, the Debtor relied solely on a the letter it received from its general contractor
regarding the general contractor's observance of nails and debris on the roof of the Ardmore
Farmer's Market during a site visit.  See id.  I do not find the Debtor's evidence convincing.
Nowhere in this letter does the general contractor accuse Harkins of substandard work.  See Trial
Ex. D-3.  Additionally, the testimony of the Debtor's own witness belies its claim.  Raymond
Perotti, the Debtor's President, testified that he did not consider the observation of debris at a
work site to be unusual in the construction context.  (N.T. at 33, 34).  Mr. Perotti also conceded
that the debris was cleaned up.  (N.T. at 34).  The Debtor did not introduce any evidence to
suggest that the debris caused any damage to the roof and conceded that other subcontractors, in
addition to Harkins, were also responsible for some of the debris.  I do not find that this minor
incident rises to a level to excuse payment to Harkins.

Second, the Debtor contends that it was required to supply additional labor to
finish the Ardmore construction project on time.  The Debtor did not quantify the labor supplied.

work on these Projects at its own risk; that having failed to submit written change orders,

Harkins cannot recover for additional work performed.  The Union counters that the Debtor

never insisted on the formality of written change orders, that Ken Harle had authority to verbally

approve the contract overages and that, accordingly, Harkins is due the balance for both projects.

   Pennsylvania law applies to the resolution of the parties' contractual dispute.  See

State Bank of Chicago v. King, 90 A. 453 (Pa. 1914) (the law of the state where the contract was

made and performed governs its construction, validity and enforcement).  Pennsylvania has

adopted the doctrine of apparent authority.  See, e.g., Turner Hydraulics, Inc. v. Susquenhanna

Constr. Corp., 606 A.2d 532, 534 (Pa. Super. Ct. 1992).  Apparent authority exists "where a

principal, by words or conduct, leads people with whom the alleged agent deals to believe that

the principal has granted the agent authority he or she purports to exercise."  Id.  Apparent

authority is the "power to bind a principal which the principal has not actually granted but which

he leads persons with whom his agent deals to believe that he has granted," for instance where

"the principal knowingly permits the agent to exercise such power or if the principal holds the

agent out as possessing such power." Revere Press, Inc. v. Blumberg, 246 A.2d 407, 410 (Pa.

1968); accord, In re Asousa Partnership, 2004 WL 1043149, at *4 (Bankr. E.D. Pa. April 26,

2004).  The nature or extent of an agent's authority is a question of fact for the trier.  See Turner

Hydraulics, Inc., 606 A.2d at 534-35.  The trier "is to evaluate the conduct of the parties in light

---

Additionally, I do not find that the Debtor has introduced evidence sufficient to place the blame
for the time pressure on this project on Harkins.  There was testimony that the initial site plans
needed to be revised once the workers got on site and that equipment arrived late to the site, both
of which contributed to progress of work.  (N.T. at 26, 31, 53-55).  Additionally, the Debtor
failed to introduce any evidence of damages attributed to its need to help finish the job in time
for its grand opening.

of the circumstances in determining the existence of apparent authority."  Id.

Having carefully reviewed the particular facts of this case and the law of apparent authority in Pennsylvania, I find that the Debtor gave Harkins the right to believe that Ken Harle had the authority to approve extra work on the Ardmore and Bahama Breeze projects and to bind the Debtor to an obligation to pay for work Mr. Harle authorized.  See, e.g., Revere Press, Inc., 246 A.2d at 410 ("a third party can rely on apparent authority of an agent when this is a reasonable interpretation of the manifestations of the principal").  Prior to working together on the Ardmore and Bahama Breeze Projects, the Debtor and Harkins had a ten-year working relationship.  (N.T. at 47).  Throughout that time, the Debtor held out Ken Harle as its main point of contact for Harkins.  (N.T. at 47-48).  The Debtor permitted Ken Harle to act on its behalf with respect to tasks involving its construction projects that caused Harkins to reasonably believe that Mr. Harle's authority extended to the Debtor's contractual obligations.  For example, with respect to the Ardmore and Bahama Breeze Projects in particular, the Debtor appointed Ken Harle to negotiate the projects with Harkins on its behalf.  The Debtor also directed Harkins to submit bids on the Projects to Mr. Harle and held out Mr. Harle as the person who conveyed the Debtor's acceptance of those bids.  (N.T. at 17-18, 27, 49, 69, 52-53  ).  Mr. Harle was also the person who provided the initial plan specifications and drawings to Harkins, documents which comprised the initial scope of work upon which Harkins premised bids.  (N.T. at 8).

Additionally, with respect to work done on the site, the Debtor's President testified that the Debtor held out Mr. Harle as its "point man" on the job in terms of dealing with the subcontractors, like Harkins.   (N.T. at 30).  With respect to the Debtor's course of conduct with Harkins, the Debtor's President  testified:

-24-

Q:     And you had a relatively long history with Harkins, isn't that right?

A:     Yes.

Q:     And Ken Harrel [sic], as well, had a relatively long working history.

A:     Yes.

Q:     And Ken had authority to act on Perotti's behalf when dealing with Harkins, isn't that right?

A:     He had authority, but he used to clear things with me, and he didn't have any authority to sign any contracts.

Q:     Okay.  But there was no written agreement other than this bid in this case.

A:     Right, right.

* * * *

Q:     And there was no written agreement which said there had to be written change orders either, was there?

A:     No.

Q:     So generally speaking, from Harkins' point of view, if Ken Harrel [sic] said go ahead and do something, he had authority to say that on behalf of Harkins, right?

A:     In some cases, yes.

(N.T. at 32-33).

No matter what understanding may have existed privately between the Debtor and Mr. Harle with respect to the nature of the things that Mr. Harle cleared with Mr. Perotti, I find that the record is devoid of any evidence that the Debtor conveyed any limitations on Mr. Harle's authority to Harkins.  Harkins testified that when it realized that some portion of the Ardmore or

-25-

Bahama Breeze Projects required additional work, it would submit an estimate to Ken Harle

concerning what the additional work would cost.  (N.T. at 55).  Harkins then reasonably assumed

that Mr. Harle passed on Harkins' estimate to the general contractor or site owner.  (N.T. at 55).

When Harkins "heard back" on these estimates, it was Ken Harle that Harkins heard from, and

Ken Harle authorized all of the work that Harkins did on these Projects.  (N.T. at 55).

Furthermore, following the submission of certain invoices that contained extra stall work – work

as to which there was no written change order and as to which Ken Harle gave verbal approval –

Harkins received $24,340 in payment from R.H.R.

        Under Pennsylvania law, although a third party, such as Harkins, cannot rely on

the apparent authority of an agent to bind a principal if it knows the limits of the agent's

authority, without such actual knowledge, Harkins is entitled to believe the agent has the

authority he purports to exercise where a person of ordinary prudence, diligence and discretion

would so believe.  Bolus v. United Penn Bank, 525 A.2d 1215, 1222 (Pa. Super. Ct. 1987) (citing

Friedman v. Kasser, 481 A.2d 886 (Pa. Super Ct. 1984)); see also Passarelli v. Shields, 156 A.2d

343, 347 (Pa. Super. Ct. 1959) (where principal places agent in position which, "according to the

ordinary experience and habits of mankind, it is usual for the occupant to have authority of a

particular kind," a third party is justified in inferring that the agent has such authority, "unless the

contrary shall be made known")(citation omitted). Under these circumstances, I find that Harkins

was entitled to believe that when Ken Harle authorized extra work, that authorization bound the

Debtor to pay for that work and that Harkins acted as a reasonable subcontractor would under the

circumstances.  Accordingly, I find that Ken Harle, as apparent agent for the Debtor, exposed the

Debtor to an obligation to pay for the work he authorized Harkins to perform.

For the reasons set forth above, I overrule the Debtor's objection and allow the

Union an unsecured claim in the amount of $68,697.86. <u>See</u> Finding of Fact No. 52 & n.5, <u>supra</u>.

An Order consistent with this Opinion shall follow.

Date:   **December 20, 2006**                    _____
                                                  **ERIC L. FRANK**
                                                  **U.S. BANKRUPTCY JUDGE**

## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | **Chapter 11** |
| | : | |
| **R.H.R. MECHANICAL CONTRACTORS, INC.** | : | |
| | : | **Bky. No. 04-18715ELF** |
| **Debtor** | : | |
| | : | |

# O R D E R

**AND NOW,** upon consideration of the Debtor's Objection to the Claim of the Sheet Metal Workers Local 19 Benefit Funds  ("the Objection"), and after a hearing, and for the reasons set forth in the accompanying Opinion, it is hereby **ORDERED** that:

1. The Objection is **SUSTAINED IN PART AND OVERRULED IN PART**.

2. The proof of claim of the Sheet Metal Workers Local 19 Benefit Funds (Claim No. 41) is

   **ALLOWED** as an unsecured claim in the amount of **$68,697.86**.

Date:    **December 20, 2006**      _____

                                                    **ERIC L. FRANK**
                                                    **U.S. BANKRUPTCY JUDGE**